349 So.2d 1283 (1977)
Dayne LEBLANC
v.
COMMERCIAL UNION ASSURANCE COMPANY.
No. 11277.
Court of Appeal of Louisiana, First Circuit.
June 13, 1977.
Rehearing Denied September 23, 1977.[*]
Writ Refused November 4, 1977.
*1285 Glynn A. Long, Donaldsonville, for plaintiff and appellee.
Daniel R. Atkinson, Baton Rouge, for defendants and appellants.
Before LANDRY, EDWARDS and COLE, JJ.
LANDRY, Judge.
This appeal presents an initial interpretation of the Louisiana Workmen's Compensation Law, as amended by Act 583 of 1975. Plaintiff sued for benefits for disability resulting from lung injuries due to inhalation of ammonia gas in the course of plaintiff's employment by Petroleum Service Corporation, Donaldsonville, Louisiana, manufacturer of industrial plant products. The accident occurred September 8, 1975. From judgment awarding plaintiff compensation for partial disability at the rate of $85.00 weekly from date of injury to March 5, 1976, Commercial Union Assurance Company (Appellant), insurer of Petroleum Service Corporation, has appealed. Plaintiff has answered the appeal seeking statutory penalties and attorney's fees denied by the trial court. We affirm the judgment denying plaintiff penalties and attorney's fees. We amend the judgment to award plaintiff compensation from September 8, 1975, to the date on which plaintiff obtained other employment at wages in excess of those earned at the time of plaintiff's injury, and remand this matter to the trial court for determination of the date of said other employment.
Plaintiff's duties consisted primarily of operating a tractor equipped with a front end loader for loading ammonia and a substance known as urea at his employer's plant. At approximately 6:00 A. M., September 8, 1975, plaintiff was driving his tractor in his employer's establishment when plaintiff encountered a cloud of ammonia gas which resulted from an ammonia leak or spill. Plaintiff proceeded through the cloud while attempting to protect himself by placing a handkerchief over his nose and eyes. On emerging from the cloud within two or three minutes, plaintiff experienced a burning sensation in his lungs. He also began to cough and sneeze and felt a burning sensation in his eyes and facial skin.
On September 12, 1975, plaintiff consulted Dr. John Savoie, plaintiff's family physician. Dr. Savoie found no objective symptoms of lung involvement, but noted that plaintiff was not feeling well and had apparent *1286 difficulty breathing. Dr. Savoie found no chest rales and no wheezing but, nevertheless, found plaintiff in moderate distress. Thinking that plaintiff would recover shortly, Dr. Savoie prescribed medication and rest. On September 17, 1975, plaintiff returned to Dr. Savoie, complaining of chest pain, especially on deep breathing. On this occasion, Dr. Savoie referred plaintiff to Dr. Clay Waguespack, specialist in lung ailments. Subsequently, Dr. Savoie saw plaintiff October 7, 21, November 18, December 1, 12, 1975; January 6, 27, 28, February 10, 16, March 5, April 12, and May 5, 1976. On March 5, 1976, Dr. Savoie discharged plaintiff as being able to resume his former occupation.
Dr. Waguespack saw plaintiff on September 25, 1975. In a report to Dr. Savoie, dated September 29, 1975, Dr. Waguespack indicated he felt plaintiff should proceed to lead a normal life, but that Dr. Savoie should see plaintiff every two weeks until plaintiff's exertional dyspnea (shortness of breath on exertion) subsided completely. On November 4, 1975, Dr. Waguespack saw plaintiff again. In a report to Dr. Savoie dated November 6, 1975, Dr. Waguespack indicated he found plaintiff still short of breath on exertion. He also noted a continuing impediment to the transfer of oxygen into plaintiff's bloodstream. The report recommended that plaintiff be continued on modest limitation of activity for two months and further examination be made. On January 19, 1976, Dr. Waguespack saw plaintiff for the last time. After examination, he reported to Dr. Savoie on January 26, 1976, that plaintiff should proceed to lead a normal life.
In a deposition taken May 18, 1976, and introduced in lieu of his testifying, Dr. Waguespack indicated that as of November 10, 1975, he felt that plaintiff was able to lead a normal life. He also indicated that he did not ever tell plaintiff that plaintiff could or could not resume plaintiff's former employment because this matter never arose, and Dr. Waguespack assumed Dr. Savoie would make the ultimate decision as to when plaintiff could return to work. Dr. Waguespack also deposed he was aware from plaintiff's first visit plaintiff was riding a motorcycle, playing touch football and began playing basketball when the football "season" ended. The deposition also indicates that, in reaching the decision that plaintiff could lead a normal life after November 10, 1975, Dr. Waguespack was influenced to some degree by the nature of plaintiff's continued activities.
Dr. Savoie testified at the trial. He did not consider plaintiff sufficiently well to resume work prior to March 5, 1976. He reached this conclusion based on his repeated examinations of plaintiff and also upon telephone conversations with Dr. Waguespack upon receipt of Dr. Waguespack's reports. Dr. Savoie's testimony makes it clear that while he felt plaintiff could lead an essentially normal life prior to March 5, 1976, he did not feel that plaintiff's lung condition had progressed to the point where plaintiff should work in an environment where ammonia and other fumes were present. He noted that ammonia gas was the cause of plaintiff's initial problem. Dr. Savoie was also aware that plaintiff was actively engaging in sports, commencing a few days after the accident, which activities Dr. Savoie recommended and approved, provided plaintiff exercised moderation. Dr. Savoie's testimony varies somewhat from that of Dr. Waguespack concerning discussion between them as to whether plaintiff should return to work involving exposure to ammonia fumes prior to March 5, 1976. The trial judge considered this variance and found that in all probability Dr. Waguespack had merely forgotten these conversations with Dr. Savoie. We share this conclusion. We also agree with the trial court's conclusion that Dr. Savoie, based on his own examinations and Dr. Waguespack's recommendations, found it would have been detrimental to plaintiff's health for plaintiff to resume work prior to March 5, 1976.
It is conclusively established that plaintiff was earning $4.60 per hour at the time *1287 of the accident; that plaintiff did not attempt to resume his former employment; and, that plaintiff obtained employment as an automobile mechanic in February, 1976, at an hourly wage of $5.00.
Appellant discontinued compensation payments on November 10, 1975, in reliance on Dr. Waguespack's report. Relying on this same report, Appellant contends no compensation whatsoever is due plaintiff beyond November 10, 1975, and that the trial court properly rejected plaintiff's claims for penalties and attorney's fees.
Prior to the 1975 amendment, our Workmen's Compensation Law LSA-R.S. 23:1221(1)(2) and (3) defined temporary total, permanent total and partial disability and fixed the benefits therefor as follows:
"(1) For injury producing temporary total disability to do work of any reasonable character, sixty-five per centum of wages during the period of disability, not beyond three hundred weeks.
(2) For injury producing permanent total disability to do work of any reasonable character, sixty-five per centum of wages during the period of disability, not beyond four hundred weeks.
(3) For injury producing partial disability to do work of any reasonable character, sixty-five per centum of the difference between wages at the time of injury and wages which the injured employee is able to earn thereafter during the period of disability, not beyond three hundred weeks."
As amended by Act 583 of 1975, the above mentioned statutory provisions now provide in pertinent part, as follows:
"(1) For injury producing temporary total disability of an employee to engage in any gainful occupation for wages whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training, and experience, sixty-six and two-thirds percentum of wages during the period of such disability.
(2) For injury producing permanent total disability of an employee to engage in any gainful occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training, and experience, sixty-six and two-thirds per centum of wages during the period of such disability.
(3) For injury producing partial disability of the employee to perform the duties in which he was customarily engaged when injured or duties of the same or similar character, nature, or description for which he was fitted by education, training, and experience, sixty-six and two-thirds per centum of the difference between the wages the employee was earning at the time of the injury and any lesser wages which the injured employee actually earns in any week thereafter in any gainful occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training, and experience, during the period of disability, but not beyond a maximum of four hundred weeks for such partial disability resulting from injury occurring on and after September 1, 1975, and on or before August 31, 1976." (Emphasis by the court.)
It appears the 1975 amendment has made a significant change in the statutory definition of temporary total and permanent total disability. We find that amended Section 1221(1) and (2), above, define total disability, whether temporary or permanent, to mean disability to engage in any gainful occupation whether or not the same *1288 or one similar to that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee was fitted at the time of the injury, either by education, training or experience. We understand the definitions to mean that an employee is not totally disabled, either temporarily or permanently, unless he is disabled from performing any gainful work whatsoever. We so find because the amended statute employs the phrase "disability . . . to engage in any gainful occupation for wages ..." We readily perceive problems in interpreting the present statutory definition of total disability. We find this a matter of no moment, however, insofar as concerns the case at hand because we find plaintiff in this instance was partially disabled for reasons hereinafter set forth.
Section 1221(3), above, as amended in 1975, defines partial disability as partial disability to perform the duties in which the employee was customarily engaged when injured or duties of the same or similar character, nature or description for which he was fitted by education, training and experience. We interpret the definition of partial disability to mean that if an injured employee is unable to perform his usual or customary occupation, but can engage in some other gainful employment for which he is fitted by education, training or experience, he is only partially disabled.
It appears the amended statutory definition of partial disability is substantially the same as total disability, as the latter term was judicially interpreted prior to the 1975 amendment. Under prior jurisprudence, an employee was considered totally disabled when he could not perform work of the same or similar description in which he was engaged when injured, notwithstanding his ability to earn the same or higher wages in a different line of endeavor. Wright v. National Surety Corp., 221 La. 486, 59 So.2d 695 (1952); Morgan v. American Bitumuls Co., 217 La. 968, 47 So.2d 739 (1950).
Our jurisprudence is firmly established to the effect that our Workmen's Compensation Law is to be liberally construed to the end that its coverage will be extended to injured workmen to relieve them of the crushing economic burden of work-connected injuries by spreading such loss in channels of commerce and industry. Danielsen v. Security Van Lines, Inc., 245 La. 450, 158 So.2d 609 (1963); Broussard v. Beebe's Bakery, Inc., 254 So.2d 284 (La.App. 4th Cir. 1971).
Also pertinent herein is the rule that an injured workman is not required to work in appreciable pain or under circumstances which present a material increase in hazards to his health or welfare. Lawless v. Steel Erectors, Inc., 254 La. 37, 222 So.2d 849 (1969); Brannon v. Zurich General Accident & Liability Ins. Co., 224 La. 161, 69 So.2d 1 (1953).
Applying the foregoing rules of interpretation herein, we find the present definition of partial disability includes a situation wherein an employee, though physically able to resume his former employment, and although physically capable of performing other gainful work for which he is fitted by education, training or experience, is otherwise temporarily unable to resume his former employment because it involves working conditions hazardous to his health or welfare.
It appears that the amendment to 1221, above, was intended to relieve the effect of prior jurisprudence which held that an injured employee was entitled to benefits when he could not perform the same or similar work in which he was engaged when injured but could, nevertheless, earn wages at some other occupation. We so find, because Section 1221(3), as amended in 1975, fixes compensation for partial disability at ". . . sixty-six and two-thirds per centum of the difference between the wages the employee was earning at the time of the injury and any lesser wages which the injured employee actually earns in any week thereafter in any gainful *1289 occupation . . .." (Emphasis by the court.) We interpret this language to mean that a partially disabled employee who remains unemployed during the continuance of partial disability is entitled to receive the compensation presently provided in Section 1221(3), above, for the period of such disability, not exceeding 400 weeks. If, however, such an employee secures other employment at wages less than those earned at the time of injury, he is entitled to compensation at the rate of sixty-six and two-thirds per cent of the difference between the wages earned at time of injury and wages actually earned thereafter in any other work. If such an employee earns wages equal to or greater than those earned at time of injury, he is entitled to no compensation during the period such equal or greater wages are earned. It is elementary that the right to any compensation whatsoever ceases upon cessation of partial disability. That there might be inherent inequity in the present definition of partial disability and the benefits provided therefor, is a matter which addresses itself to the legislature. Our function is to interpret the statute as written. We find that the statute as amended intends that a partially disabled employee shall be paid compensation for such period of disability during which he earns no wages in any gainful occupation.
We find the trial court properly held that plaintiff's disability was partial and that his disability ceased as of March 5, 1976. The trial court erred, however, in awarding plaintiff compensation to that date. Although partially disabled, plaintiff accepted other employment in February, 1976, at wages in excess of those plaintiff was paid at the time of injury. The record does not, however, show the precise date plaintiff began such other employment.
Plaintiff is entitled to compensation only from the date of injury to such date as he became employed at wages equal to or greater than those received at the date of injury, which the record shows to be some time in February, 1976. We find it necessary to remand this cause to the trial court for determination of that precise date and the rendition of judgment awarding plaintiff compensation from date of injury to commencement of such other employment.
We find the trial court quite properly rejected plaintiff's demand for statutory penalties and attorney's fees. In view of Dr. Waguespack's reports, Appellant was justified in discontinuing compensation payments as of November 10, 1975.
The judgment of the trial court is reversed insofar as it awarded plaintiff compensation to March 5, 1976. In all other respects, the judgment is affirmed, and this matter is remanded to the trial court for further proceedings consistent with the views herein expressed; all costs of this appeal to be paid by plaintiff.
Affirmed in part, reversed in part and remanded.
NOTES
[*] COLE, J., dissented from the refusal to grant a rehearing.