398 So.2d 37 (1981)
Tony FERRAND
v.
KAISER ALUMINUM & CHEMICAL CORPORATION.
No. 11948.
Court of Appeal of Louisiana, Fourth Circuit.
March 10, 1981.
Rehearing Denied May 15, 1981.
Heisler & Wysocki, Vincent Paciera, Jr., New Orleans, for plaintiff-appellant.
Lemle, Kelleher, Kohlmeyer & Matthews, Paul B. Deal, New Orleans, for defendant-appellee.
Before GULOTTA, BOUTALL, GARRISON, CHEHARDY and STOULIG, JJ.
CHEHARDY, Judge.
Plaintiff, Tony Ferrand, appeals from a trial court decision in favor of the defendant, Kaiser Aluminum & Chemical Corporation (Kaiser), dismissing the plaintiff's suit for workmen's compensation benefits at his costs.
Ferrand testified at trial that he began working for Kaiser on June 15, 1976 as a laborer in that company's "pot room", which was described by him as a very humid, hot and dusty area where chemicals were mixed. He added the company provided workers in that locale with salt tablets due to the temperatures sustained in the room. The plaintiff stated his employment with Kaiser was terminated in March of 1977.
Ferrand said at trial he first saw a physician, Dr. William Ogden, II, in October of 1976 regarding boils and cysts he had developed on his scalp. He also stated that after *38 he stopped working for Kaiser in March of 1977, due to his scalp condition, he was then paid an additional seven weeks of income benefits. At the end of that period, although he was released by his attending physician for work other than in the pot room, he was told by Kaiser no job other than working in the pot room was available for him because of his lack of seniority.
Ferrand also testified that after his termination he was not employed again until November of 1978, when he became a parking attendant for a hotel. He was still working in this position at the date of trial on March 14, 1979.
Dr. David Bradley, who was accepted by the court as an expert in the field of dermatology, stated he first saw Ferrand on May 12, 1977, and his diagnosis was that he had folliculitis, an inflammation of the hair follicules or an infection of the scalp, manifested by inflammation, pus formation and pimples. Dr. Bradley said he prescribed a selenium sulfide shampoo and antibiotics to be taken by mouth, supplemented by antibiotic injections.
Dr. Bradley also stated that although it is not known why a person develops folliculitis, it is known that certain factors, such as excessive sweating and working in a very warm area, do contribute to the condition. He added that the last time he saw plaintiff, on January 26, 1979, Ferrand still had the condition and that it was a persistent one, without very much permanent response to the treatment administered over the two prior years. His opinion was that he expected the problem, which he described as chronic, to continue "for some time longer", and he added that Ferrand is employable except in extremely hot environments.
Dr. Edward Thornhill, accepted by the court as an expert in the field of internal medicine, said he first saw Ferrand on March 22, 1977. He diagnosed the plaintiff as having a recurrence of folliculitis as well as muscle contraction headaches as a result of the scalp infection. His opinion was that the cysts were a direct result of excessive heat and atmospheric moisture. He also stated he prescribed pain medication and antibiotics and he instructed the plaintiff to stay out of the pot room. Dr. Thornhill also opined that had Ferrand not been working in an area of high temperature and humidity, the chances of his developing folliculitis would have been very small.
Ferrand testified he had a tenth grade education and that prior to his employment at Kaiser he had worked with a construction crew building wharves, had been a lifeguard and had worked at the Rivergate setting up for meetings and banquets. Ferrand also said after his termination he began applying for jobs such as bellman and porter at various hotels so he could work inside and not become too overheated. He added he had informed these prospective employers that he was on medication and could not work in high heat areas; he was not offered a job until November of 1978.
In the case of LeBlanc v. Commercial Union Assur. Co., 349 So.2d 1283, 1288 (La. App. 1st Cir. 1977), the court said:
"Section 1221(3), above, as amended in 1975, defines partial disability as partial disability to perform the duties in which the employee was customarily engaged when injured or duties of the same or similar character, nature or description for which he was fitted by education, training and experience. We interpret the definition of partial disability to mean that if an injured employee is unable to perform his usual or customary occupation, but can engage in some other gainful employment for which he is fitted by education, training or experience, he is only partially disabled.
"It appears the amended statutory definition of partial disability is substantially the same as total disability, as the latter term was judicially interpreted prior to the 1975 amendment. Under prior jurisprudence, an employee was considered totally disabled when he could not perform work of the same or similar description in which he was engaged when injured, notwithstanding his ability to earn the same or higher wages in a different line of endeavor. Wright v. National Surety *39 Corp., 221 La. 486, 59 So.2d 695 (1952); Morgan v. American Bitumuls Co., 217 La. 968, 47 So.2d 739 (1950).
"Our jurisprudence is firmly established to the effect that our Workmen's Compensation Law is to be liberally construed to the end that its coverage will be extended to injured workmen to relieve them of the crushing economic burden of work-connected injuries by spreading such loss in channels of commerce and industry. Danielsen v. Security Van Lines, Inc., 245 La. 450, 158 So.2d 609 (1963); Broussard v. Beebe's Bakery, Inc., 254 So.2d 284 (La.App. 4th Cir. 1971).
"Also pertinent herein is the rule that an injured workman is not required to work in appreciable pain or under circumstances which present a material increase in hazards to his health or welfare. Lawless v. Steel Erectors, Inc., 254 La. 37, 222 So.2d 849 (1969); Brannon v. Zurich General Accident & Liability Ins. Co., 224 La. 161, 69 So.2d 1 (1953).
"Applying the foregoing rules of interpretation herein, we find the present definition of partial disability includes a situation wherein an employee, though physically able to resume his former employment, and although physically capable of performing other gainful work for which he is fitted by education, training or experience, is otherwise temporarily unable to resume his former employment because it involves working conditions hazardous to his health or welfare."
The court also said in Parks v. Insurance Co. of North America, 340 So.2d 276 (La. 1976), at pages 280-281:
"In order to recover benefits under the Louisiana Workmen's Compensation Law, an employee must establish that he received a personal injury by accident arising out of and in the course of his employment. Disability is compensable only if it results from a work-related accident. La.R.S. 23:1031; Gorbach v. Prager, Inc., 310 So.2d 604 (La.1975); Prim v. City of Shreveport, 297 So.2d 421 (La.1974). Hence, the first issue presented for our consideration is whether or not an accidental injury occurred.
* * * * * *
"The terms `accident' and `injury' for the purpose of the workmen's compensation statute are defined in La.R.S. 23:1021 as follows:
(1) "Accident" means an unexpected or unforeseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury.
(7) "Injury" and "Personal Injuries" includes only injuries by violence to the physical structure of the body and such disease and infections as naturally result therefrom. These terms shall in no case be construed to include any other form of disease or derangement, howsoever caused or contracted.
"* * * We have held that extraordinary physical stress and strain is not essential to the definition of disabling accident: when the performance of the usual and customary duties of a workman cause or contribute to a physical breakdown, the statutory requirements for an accidental injury are present. Ferguson v. HDE, Inc., 270 So.2d 867 (La.1972); Bertrand v. Coal Operators Casualty Co., 253 La. 1115, 221 So.2d 816 (1968) [sic]. More particularly, we have recognized that the fact that a condition may commonly be referred to as an illness or disease does not thereby preclude its classification as an accident. Jennings v. Louisiana Southern Life Insurance Co., 290 So.2d 811 (La.1974). In Jennings, we noted that among other conditions frequently termed as diseases, heart disease, stroke, heat stroke, herpes zoster (shingles), cancer and `bends' have all been treated as compensable accidents within the contemplation of the Workmen's Compensation Act. * * *
"* * * Our jurisprudence demonstrates that it is not necessary that an accident be caused by extraordinary activities of an employee or that said activities be the exclusive cause of an accidental injury. It is only necessary that the accidental injury be caused or precipitated *40 by the usual and customary actions, exertion, or other factors directly connected with the employment. Roussel v. Colonial Sugars Co., 318 So.2d 37 (La. 1975). It is immaterial that the disability could have been brought on by causes other than a work-related trauma, if, in fact, trauma on the job which meets the standards of accidental injury is a disabling factor. Bertrand v. Coal Operators Casualty Co., 253 La. 1115, 221 So.2d 816 (1969). We have recently held, moreover, that an accident which aggravates or accelerates a pre-existing condition is compensable even where disability is not caused by a single or specific incident. Chism v. Kaiser Aluminum & Chemical Corp., 332 So.2d 784 (La.1976)."
In the present case this court finds the infection of folliculitis suffered by the plaintiff was certainly precipitated by the conditions under which he worked in the pot room at Kaiser, notwithstanding he probably had a predisposition to the disease. We find, moreover, that this condition is within the meaning of the word "injury" as it is used in the Workmen's Compensation Act. We also find that since Ferrand is unable to perform work of the same or similar description in which he was engaged when injured, he must be considered partially disabled for the purpose of receiving workmen's compensation benefits.
LSA-R.S. 23:1221 states in part:
"Compensation shall be paid under this Chapter in accordance with the following schedule of payments:
* * * * * *
(3) For injury producing partial disability of the employee to perform the duties in which he was customarily engaged when injured or duties of the same or similar character, nature, or description for which he was fitted by education, training, and experience, sixty-six and two-thirds per centum of the difference between the wages the employee was earning at the time of the injury and any lesser wages which the injured employee actually earns in any week thereafter in any gainful occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee, at the time of injury, was particularly fitted by reason of education, training, and experience, during the period of disability, but not beyond a maximum of four hundred weeks for such partial disability resulting from injury occurring on and after September 1, 1975, and on or before August 31, 1976; and not beyond a maximum of four hundred twenty-five weeks for such partial disability resulting from injury occurring on and after September 1, 1976, and on or before August 31, 1977 * * * the employer shall be entitled to a reduction of one full week of compensation against the maximum number of weeks for which compensation is payable under this subdivision (3) and for any week during which the employee is paid no compensation, because of the employee's actual earnings during that week, the employer shall not be entitled to a reduction for that week against the maximum number of weeks for which compensation is payable under this subdivision (3), and in no event shall the total number of weeks of compensation for such partial disability under this subdivision (3) be increased beyond the maximum number of weeks stated in this subdivision (3)."
LSA-R.S. 23:1202 also reads in part:
"(1) The maximum compensation to be paid under this Chapter for injuries occurring on or after September 1, 1975, and on or before August 31, 1976, shall be eighty-five dollars per week and the minimum compensation shall be twenty-five dollars per week; and for injuries occurring on or after September 1, 1976, and on or before August 31, 1977, the maximum weekly compensation to be paid under this chapter shall be ninety-five dollars per week and the minimum compensation shall be thirty dollars per week. For injuries occurring on or after September 1, 1977, the maximum weekly compensation to be paid under this Chapter *41 shall be sixty-six and two-thirds per centum of the average weekly wage paid in all employment subject to the Louisiana Employment Security Law and the minimum compensation shall not be less than twenty per centum of such wage, said maximum and minimum to be computed to the nearest multiple of one dollar. In any case where the employee was receiving wages at a rate less than the applicable minimum compensation, the compensation shall be the employee's `wages'."
In view of the above provisions of the Workmen's Compensation Act and in view of the fact the record establishes Ferrand was unemployed from his June 1, 1977 salary termination at Kaiser through October of 1978, we hold the plaintiff is entitled to the maximum benefits of $95 a week for that period of 69 weeks and four days.
Because the record also reveals that Ferrand's salary at the time of the March 14, 1979 trial was $2.40 an hour, plus an average of $30 a week in tips, totaling $126 per week, and his hourly pay at Kaiser at the time he was terminated was $6.36, or $254 per week, he is entitled to compensation benefits of $85.60 per week, representing 662/3% of the difference between that amount he was earning at the time of his injury and the lesser wages which he was actually earning at the time of trial, this due and owing for 19 weeks and one day, comprising the period of his new employment, which began in November of 1978 and continued until the trial date.
We also hold the defendant (Kaiser) is indebted to the plaintiff for 66 2/3% of the difference between any earnings he has had (since the trial date) and his prior earnings at Kaiser up to a maximum benefit of $95 a week for as long as his partial disability continues up to a maximum of 336 weeks and two days from the date of March 15, 1979.
LSA-R.S. 23:1203 states in part:
"In every case coming under this Chapter, the employer shall furnish all necessary medical, surgical and hospital services, and medicines, or any nonmedical treatment recognized by the laws of this state as legal."
Dr. Bradley testified the total of his fees incurred by the plaintiff up to the trial date was $465. Plaintiff also presented, as part of his exhibits, an invoice establishing that fees for services rendered to him by Dr. Ogden totaled $165, and the charges of Dr. Dorsey Dysard, to whom Ferrand was referred by Dr. Thornhill, were $280. Bills for drugs introduced by Ferrand amounted to approximately $299. Accordingly, we also cast the defendant, Kaiser, in judgment to the plaintiff for the costs of all of the above medical services and drugs.
This court can find no basis for concluding the defendant was arbitrary and capricious in denying the plaintiff workmen's compensation benefits and, therefore, the plaintiff's request for penalties and attorney fees is denied.
For the reasons assigned, the judgment of the district court is reversed and rendered, defendant to pay all costs.
REVERSED AND RENDERED.
GULOTTA and STOULIG, JJ., dissent with written reasons.
GULOTTA and STOULIG, Judges, dissenting.
We respectfully dissent.
We can find no basis in the record for reversing the judgment of the trial court dismissing plaintiff's claim and therefore we dissent from the majority opinion.
Plaintiff, an unskilled laborer, was employed by the defendant on June 15, 1976. Lacking job seniority, under the union labor contract he was assigned the least sought after job of a "spare" in the pot room of defendant's plant. Admittedly the ambient temperature of the pot room is extremely high and humid.
Some four months later, in October, 1976, plaintiff developed a scalp condition later diagnosed as folliculitis, an inflammation of the hair follicules accompanied by pustules or pimples. From this time through the termination of his employment on June 1, *42 1977, plaintiff was treated by physicians of his own choosing, Dr. William W. Odgen, II, a thoracic and vascular surgeon, Dr. Edward Thornhill, an internist, and Dr. Dorsey Dysart, a neurologist.
The direct medical testimony is that the cause of folliculitis is unknown but that it is aggravated by excessive heat and humidity. Both Drs. Thornhill and Ogden testified that plaintiff could return to work and was employable by defendant in areas other than the pot room or an environment of equally high temperature and humidity. In fact, plaintiff did return to work in March, 1978 and was assigned different duties for a couple of weeks.
At this point in time, plaintiff was advised by defendant's personnel director that no other openings were available to him except the pot room because he lacked union seniority to displace anyone from a more compatible job. This latter fact was subsequently confirmed by a union hearing. On June 1, 1977, plaintiff's services were terminated by the defendant for excessive absences.
In November, 1978, plaintiff secured a job with the Marriott Hotel as a parking attendant and is presently employed in this capacity. It is interesting to note that plaintiff received unemployment compensation benefits of $116.00 per week for a period of fifteen months and shortly after the expiration of these benefits he found employment with the Marriott Hotel.
We cannot agree with defendant's contention that folliculitis is not an accident within the scope of the workmen's compensation statute. As noted in Jennings v. Louisiana Southern Life Ins. Co., 290 So.2d 811 (La.1974), the mere fact that a condition may be commonly referred to as a disease or illness does not preclude its classification as an accident under the statute. During his illness plaintiff was paid benefits which actually exceeded the compensation benefits prescribed by the Workmen's Compensation Act.
The evidence preponderates in favor of the conclusion that plaintiff has failed to sustain his right to additional workmen's compensation benefits. It is beyond dispute that the folliculitis was not caused by plaintiff's employment. Because the cause of folliculitis is unknown to medical science, it must be assumed that the expert testimony that excessive heat and humidity precipitated or aggravated the condition is based upon the fact that it manifested itself in this environment.
Plaintiff's own medical experts were of the opinion that he could return to work in March, 1977 and adjudged him to be employable in June, 1977, except in a high degree of temperature and humidity associated with a pot room. Plaintiff is now and has been employed, admittedly at a lesser salary, which reduction in earning power is not attributable to any physical disability resulting from folliculitis or an aggravation of this condition. It is factually and medically established that folliculitis does not render a person unemployable or significantly affect his ability as a common laborer to secure employment in the open market. Dr. Edward Thornhill testified that "it is difficult to evaluate" if once a person develops folliculitis he becomes more susceptible to a recurrence of this condition because it depends upon "the bacteria of the skin."
In Parks v. Insurance Co. of North America, 340 So.2d 276 (La.1976), a case somewhat factually analogous to this matter, the Supreme Court held:
"In the instant case, the medical testimony as well as that of plaintiff herself indicates that she was fully recovered from her acute illness and that she now enjoys a state of health comparable to that which existed prior to October 10, 1973. While it is obvious that plaintiff was temporarily totally disabled from that date until her acute illness terminated, she has now been returned to her pre-illness condition and there is no evidence that the acute bronchitis attack left any residual effects whatsoever. The inadviseability of plaintiff's working in a garment factory is no greater now than it was when she commenced working for Garan in May, 1973. We are of the opinion *43 that where, as here, plaintiff fails to demonstrate that her physical condition after an acute illness is altered in any respect, she cannot recover total and permanent disability payments. In short, plaintiff's disability to work in a garment factory is not related to the accident which she sustained."
Predicated upon the concept expressed in Parks, it must be concluded that plaintiff was temporarily totally disabled from October, 1976 to June, 1977, during which period he was paid more in wages and benefits than required under the compensation act. To paraphrase Parks, the inadviseability of plaintiff working in a pot room is no greater now than it was when he commenced working for the defendant. The obligation of the employer is to restore the employee to the same physical condition or state of health as existed at the time he suffered the disability. The defendant has fulfilled this obligation owed to the plaintiff.
For these reasons the judgment of the trial court should be affirmed.