468 A.2d 693

**Bernard P. OROS**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

**John B. SMITH, Sr.**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

**Gary Joseph FISCHER**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

**Nos. 279, 317 and 318, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Dec. 15, 1983.

Michael J. Fedock, III, Baltimore, for appellants.

L. William Gawlik, Asst. Sol. for Baltimore City, with whom were Benjamin L. Brown, City Sol. for Baltimore City, Sheldon H. Press, Chief Sol. for Baltimore City and Richard T. LaFata, Asst. Sol. for Baltimore City on brief, for appellee.

Argued before MOYLAN, LOWE and GARRITY, JJ.

LOWE, Judge.

The three appellants in these cases are all Baltimore City police officers injured in the course of their employment,

who (pursuant to a General Order promulgated by the Baltimore Police Department) were paid in full under a sick leave policy during their absence from work. The police officers did not claim temporary total disability during their absence from work since the Workmen's Compensation Act, Md.Ann.Code, Art. 101, § 33(c), states that when employees of the State or its subdivisions are provided with such benefits by their employers, the benefits will satisfy and discharge pro tanto or in full, the liability or obligation of the employer

". . . for any benefit under this article".

As we pointed out in *Nooe v. City of Baltimore,* 28 Md.App. 348, 345 A.2d 134 (1975), the current § 33(c) was enacted as a delayed response to the Court of Appeals' opinion in *Montgomery County v. Kaponin,* 237 Md. 112, 205 A.2d 292 (1964), which had denied that the purpose of the statute which preceded the present § 33(c) had been to offset workmen's compensation benefits against the benefits received from the government employer via a pension fund. We said that when the current statute was enacted, "the General Assembly was concerned with, and attempted to prohibit, governmental authorities being obliged to pay benefits to an employee twice as a result of the same injury." *Nooe, supra,* 28 Md.App. at 352, 345 A.2d 134. We obviously were referring to "injury" in the sense of damages since the statute itself permits a wage-loss benefit of two-thirds of a salary as temporary total disability and a permanent partial disability benefit to compensate for a loss of earning capacity, both arising from the same "injury". *Jackson v. Beth.-Fair. Shipyard,* 185 Md. 335, 44 A.2d 811 (1945).

Although the officers bowed to the inevitable in declining to claim their temporary total disability benefits in addition to the full salary sick leave pay provided them by the City, upon reaching their maximum cure they did petition the commission for permanent partial disability benefits. The nature and extent of the permanent partial disability of each was determined by the Commission and (pursuant to Art. 101, § 36(3) and (4)) the maximum entitlement was

established for each and payment ordered pursuant to the statute. In two of the cases (Smith and Oros), the City obtained from Commissioner Mercaldo a "credit" against its obligation to the claimants. In the case of Fischer, however, Commissioner Albert found that the City was not entitled to a set-off against an award of permanent partial disability equal to the difference between the temporary total disability rate and accident leave rate or full salary paid in lieu of temporary total disability benefits.

The City contended that during the time it had paid full salary sick leave, it was only statutorily obligated under § 36(2) to pay two-thirds of that salary. As a consequence, it reasoned, the one-third overage it paid built up a credit in the nature of a savings account that the City could offset against its future obligation for permanent partial disability when and if its nature and extent were determined. In the cases of Oros and Smith Commissioner Mercaldo agreed. Commissioner Albert, however, did not buy that argument and permitted no such credit or setoff against appellant Fischer's permanent partial award. That was not long to hold, however, because the City appealed to the Circuit Court for Baltimore City. Smith, Oros (and others) appealed the result reached by Commissioner Mercaldo.

The judge, granting summary judgment on behalf of the City, relied on *Nooe, supra,* and *Mazor v. State, Dep't of Correction,* 279 Md. 355, 369 A.2d 82 (1977). He was particularly impressed by an interpretation of the legislative purpose of § 33 to preclude double-dipping as we have above paraphrased and similar reasoning in *Nooe* which, like *Mazor,* relieved both employer and insurer from workmen's compensation obligations which were more than offset by pension benefits. After quoting our reasoning in *Nooe,* the judge added the comparable *Mazor* rationale.

> "Our holding recognizes that workmen's compensation is one facet of an overall system of wage-loss protection, and that the underlying principle of the system is to restore to the worker a portion of wages lost by physical disability, unemployment, or old age. It follows that

although two or more causes of wage loss may coincide, the benefits need not cumulate, for the worker experiences but one wage loss." *Id.* at 363, 369 A.2d 82. The judge then reasoned from these opinions

". . . that although two wage loss plans may be triggered by one work related injury, § 33(c) intended that such benefits should not cumulate and that to the extent such cumulative coverage occurs, the statute provides the offset or credit remedy the employer seeks."

On appeal appellee City reinforces that reasoning by pointing out that the identical *Mazor* rationale was repeated in *Feissner v. Prince George's Co.,* 282 Md. 413, 420–421, 384 A.2d 742 (1978). The Court of Appeals was even more explicit in *Frank v. Baltimore County,* 284 Md. 655, 659, 399 A.2d 250 (1979), where Judge Digges quoted this policy concerning wage-loss legislation once again but attributed it to its source, 4 A. Larson, *The Law of Workmen's Compensation,* § 97.10, at 18–19 (1979).

In all of those cases the overriding theme providing the foundation supporting the same result was the determination of legislative intent of § 33(c) which would minimize the burden on the public treasury that would result from duplicating benefits to public employees. *Frank, supra* at 661, 399 A.2d 250. Significantly, however, the tenor of that section as reflected in the Court opinions is that the offsetting benefits be "similar" ones. That adjective was, in fact, expressly used in the next-to-last sentence of the section and there is no reasonable distinguishing purpose to suggest that it was not intended to be implicit in the foregoing sentences.

"Whenever by statute, charter, ordinances, resolution, regulation or policy adopted thereunder, whether as part of a pension system or otherwise, any benefit or benefits are furnished employees of employers covered under § 21(a)(2) of this article, the dependents and others entitled to benefits under this article as a result of the death of such employees, the benefit or benefits when furnished by the employer shall satisfy and discharge pro tanto or in full as the case may be, the liability or obligation of the

employer and the Subsequent Injury Fund for any benefit under this article. If any benefits so furnished are less than those provided for in this article the employer or the Subsequent Injury Fund, or both shall furnish the additional benefit as will make up the difference between the benefit furnished and *the similar benefit* required in this article. Provided, however, the computation of the additional benefit shall be applicable only at the time of the initial award of benefits and shall not be applicable to any cost of living adjustments after the initial award, and this provision shall be retroactive to benefits received before July 1, 1980." Art. 101, § 33(c) (emphasis added).

The cases suggest that similarity requisite with the recurring use of Larson language relating to the philosophy of "wage-loss statutes" and the limiting of one "wage-loss benefit" for one "wage loss".

While *Nooe* was addressing temporary total disability benefits, however, which are indeed solely wage-loss benefits, both *Mazor* and *Frank* appear to have offset permanent partial disability benefits (which are more in the nature of earning capacity impairment benefits) against wage-loss pension benefits. The similarity rationale against double-dipping in such case, would hardly seem so clear.

Although workmen's compensation in its origin was contemplated simply as a wage-loss insurance payable during actual disability, it has imperceptibly evolved into a process of payment for physical impairment, often regardless of actual or presumed loss of entire. wages or earning capacity. See generally Ch. X, *Larson's Workmen's Compensation Law.* Permanent partial disability scheduled awards (Art. 101, § 36(3)) are based purely on the medical condition of the employee after maximum improvement has been reached and ignore wage loss entirely. They are paid not only after the employee returns to work, but also if his wages were increased, *Balto. Publishing Co. v. Hendricks,* 156 Md. 74, 143 A. 654 (1928), and may be paid even absent loss of wages or earning capacity. *Belschner v. Anchor Post,* 227 Md. 89, 175 A.2d 419 (1961).

The statutory language changes in Maryland also point out that we will not be bound to one philosophical concept in compensating our injured workers but tend mercurially to move more by a sense of justice than by economic philosophy. A half century ago the test for determining unscheduled permanent partial disability benefits was purely and simply a loss of earning capacity test without regard for the wage loss. *Hendricks, supra* 156 Md. at 79, 143 A. 654. The formula was simplicity itself mandating that the award

"shall be fifty per centum of the difference between the employee's average weekly wages and his wage-earning capacity thereafter." *Id.*

Under our present statute, the Commission in determining the portion or percentage by which the industrial use of the employee's body is impaired, must take into consideration, among other things,

"the nature of the physical injury, the occupation, experience, training and age of the injured employee at the time of injury, and shall award compensation in such proportion as the determined loss bears to 500 weeks . . . ." Art. 101, § 36(4)(a).

That these considerations are still primarily concerned with earning capacity loss is demonstrated by the fact that the award is paid even after the employee returns to work. Yet, to the extent that age is a consideration, wage loss is arguably contemplated by the formula, at least in the calculation of the percentage of the future wages lost to him by virtue of the impairment. If he is young when injured, the wage loss to him will be greater than if he is within contemplation of retirement. It is that proximity to retirement—the decision by the claimants to retire—that must have supported the *Mazor-Frank* results and which caused what was originally primarily compensation for lost earning capacity to serve as a wage loss recompense.

The employees in those cases appear to have elected disability pension benefits while awaiting their permanent partial disability ratings. As a consequence of that decision,

but for their pension entitlement, their sole sources of income would have been whatever they were to receive from the permanent partial disability award. Although in lesser amount that award is, by virtue of their election to retire because of disability, not unlike a permanent total disability award, *i.e.,* it would have been (because of the disability) claimants' sole income substituting for their lost wages. By reason of their disability retirement election the disability compensation benefit is "similar" in every sense to that of a disability pension. The election to retire mooted whatever lost earning capacity purpose the compensation benefit may originally have contemplated. Such is the mercurial nature of the underlying philosophy of Maryland's Workmen's Compensation Law. As seen above, the Court in those cases—and indeed the parties themselves—seemed to treat the contemplated workmen's compensation benefits as pure wage-loss benefits. It seemed clear that two disability wage-loss benefits for one wage-loss in a disability retirement situation was an unfair burden on the public employer contemplated by § 33(c). It is also significant in the similarity of offsetting benefit perspectives, that in both *Frank* and *Mazor* the comparable benefits provided were not merely retirement benefits but "disability" retirement benefits providing a further similarity to the permanent partial disability compensation benefits for which the Court held they had been substituted.

If that theoretical metamorphosis in contemplating the nature of the workmen's compensation benefits in those cases was not present, intentionally or unintentionally, the reasoning of the Court would not have supported the result. Recently, in this Court, we used the same reasoning (although without reference to § 33) to hold that where the loss of wage earning *capacity* is predicated upon the same anatomical disability, a claimant is precluded from the payment of double compensation for the same wage earning capacity loss, even when payments would be made by separate jurisdictions. *Dennison v. Head Const. Co.,* 54 Md.App. 310, 458 A.2d 868 (1983); see *Tsottles v. City of Baltimore,* 55 Md.App. 58, 62, 460 A.2d 636 (1983). This accords with

the rationale of the other cases, *i.e.,* if one has a wage loss he may receive only one wage-loss benefit. We added in *Dennison* that if one has an earning capacity loss one is entitled to only one earning capacity benefit.

■ But *never* have we said, or has the Court of Appeals held, that a dual entitlement to compensation for both the wage-loss and an earning capacity impairment could be discharged by payment of a single substitute wage-loss benefit.

That, of course, is precisely what appellee seeks to do. To follow the City's rationale (that the full salary sick leave benefit diminishes pro tanto not only the temporary total wage loss liability, but the subsequent diminished earning capacity liability as well, because it falls under the "*any* benefit . . . furnished employees" clause) would leave us in the embarrassing position of trying to explain why a salary paid during sick leave was a "benefit" ameliorating a subsequent earning capacity loss, while the same salary paid after a return to work would not be. We would also be hard-pressed not to permit a credit offset of such sick leave salary to be applied also to the employer's liability for medical bills. Looked at from the obverse side, if we permit the one-third overage salary credit to discharge the employer's statutory liability for earning capacity loss, the employer is permitted to use the employees' salary sick leave commitment to pay them for their own injuries in diminished earning capacity.

Just as wage enhancement is not relevant to the issue of loss of earning capacity, *Hendricks, supra,* we hold that wage loss benefits are equally irrelevant to lost earning capacity benefits. We do not depart from the rationale of any of the cases cited which stand for the proposition that the Legislature intended to avert duplicate similar benefits to public employees. It is contextually clear to us that when the Legislature provided that

"... any benefit ... furnished employees ... shall satisfy and discharge ... [the public employer's] liability or obligation ... for any benefit under this article...."
§ 33(c),

the Legislature intended the benefits to be comparable benefits. An orange, or even two, provided an employee will satisfy a public employer's statutory requirement to provide him with an orange, but it does not absolve an employer from the statutory requirement to give him an apple also.

We further conclude that it is absurd to believe that the Legislature intended a public employer be permitted to create a bank of credits from every fringe benefit it grants an employee to serve as markers against subsequently incurred statutory obligations. The Court of Appeals was clear that the Legislature intended to preclude double-dipping into the same pot of comparable benefits. There is not even the slightest hint that the Legislature intended to permit a public employer to take back later with one hand what it had earlier offered with the other.

We reverse the summary judgment entered on behalf of the appellee and remand the cases for whatever issues remain pending pursuant to the appeals from the Commission.

JUDGMENTS REVERSED. CASES REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.