493 A.2d 392

**Audrey J. ADAMS**

v.

**WESTERN ELECTRIC COMPANY.**

**No. 1392, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

June 10, 1985.

588

Harold R. Weisbaum, Baltimore (Jerome Blum, Baltimore, on the brief), for appellant.

Philip T. McCusker, Baltimore, for appellee.

Argued before GILBERT, C.J., and WILNER and GETTY, JJ.

WILNER, Judge.

Md.Code Ann. art. 101, § 22(a) provides, in relevant part, that

"Where an employee ... suffers from an occupational disease, and is thereby disabled from performing his work *in the last occupation in which he was injuriously exposed to the hazards of such disease* ... and the disease was due to the nature of the occupation or process in which he was employed within the period previous to his disablement ... the employee ... shall be entitled to compensation in the amount ... provided ... in this article." (Emphasis added.)

There is little dispute here that appellant Audrey J. Adams developed an occupational disease—ulnar neuropathy of the right elbow and ulnar nerve palsy in the right arm and hand—during and as a result of her employment with appellee, Western Electric Company. Although the problem first became manifest (and was first reported to appellee) in 1976, the date of her disablement was fixed as August 7, 1980. It was then that Ms. Adams began to lose time from work. The Workmen's Compensation Commission found that, by reason of her occupational disease, Ms. Adams was temporarily totally disabled from August 7 to November 4, 1980, from December 7, 1981 to April 18, 1982, and from August 30 to October 10, 1982. Appellee does not dispute those findings.

The issue before us concerns Ms. Adams's claim for permanent (partial) disability.

The precise nature of Ms. Adams's work for Western Electric is not clear from the record. At some point, she was required to use an "air gun," but apparently transferred for a time to another department where she did not have to use such a device; she then went back to using an air gun. The record does not reveal when these transfers occurred; all that was said on the subject was this, from Ms. Adams:

"Well, I was using an air gun and after I had left that job, I went to another department and for eight years I stayed on the job, that job, and that is in the area of when my hand started deteriorating. Then I went back using the air gun in another department. Then I started having pain in my hand. I didn't know what was wrong with it really."

Ms. Adams did not return to her previous job with Western Electric following her last period of temporary total disability, in part because that job no longer existed; Western Electric moved that part of its operation from the Baltimore area. She did return to work, however, in another job within the same job classification, at the same "labor grade," and at the same or higher wage rate. She does not have to use an air gun or perform functions that require "squeezing the hand." Her current job involves "washing parts."

On this evidence and the authority of *Belschner v. Anchor Post*, 227 Md. 89, 175 A.2d 419 (1961), the Commission, and, on appeal, the Circuit Court for Baltimore City, concluded that Ms. Adams was not entitled to compensation for permanent partial disability. Arguing that both the Commission and the Court misapplied *Belschner*, Ms. Adams seeks a contrary conclusion from us.

The issue considered in *Belschner* was

"whether an employee, who has continued to perform his work in a satisfactory manner without loss of wages *in the same occupation he had been engaged in for years,* is entitled to workmen's compensation for the loss of hearing he sustained as a result of exposure to high level industrial noises." (Emphasis added.)

227 Md. at 90, 175 A.2d 419. The answer given by the Court was "no." There was no doubt that Mr. Belschner had suffered an occupational disease—a 44% binaural loss of hearing due to industrial exposure—but the evidence showed that he "was doing his work 'just as well' and 'producing the same thing' as he did before the impairment and was 'making the same living.'"

The Court focused on the question of whether Mr. Belschner had actually been "disabled," which was, and is, a condition of eligibility for benefits under § 22. In that regard, the Court noted a distinction between accidental injury cases, for which the term "disability" is not statutorily defined, and occupational disease cases, where the analogous term "disablement" is so defined. Then § 67(13) of art. 101 defined "disablement" for purposes of § 22 as equivalent to "incapacity." [1] The Court held, at 93, 175 A.2d 419,

> "an employee is not incapacitated [and therefore not disabled from an occupational disease] within the intent of the law 'if, though injured, [he] still has the capacity, the ability to, and does continue to perform his regular work, for which he was employed, and receives his usual pay for the work.' "

Ms. Adams is correct in drawing a distinction between her case and *Belschner.* She is not performing precisely the same work as she did before her disease became manifest; indeed, she made clear that she could not continue in such work even if it were available to her, because she cannot operate an air gun. Is that a distinction without a difference, however?

The critical term, in both § 22(a) and § 67(15), is "last occupation." The incapacity or disablement must relate to that.

Unfortunately, the word "occupation" is not defined in art. 101, and so we must look elsewhere for its meaning. The *Belschner* Court, given the facts in that case, was spared that task.

We note initially that the Maryland approach of defining "disablement"—and with it the right to compensation for

---

1. That section, now appearing as § 67(15), defines "disablement" as "the event of an employee's becoming actually incapacitated, either partly or totally, because of an occupational disease, from performing his work in the last occupation in which exposed to the hazards of such disease...." It further defines "disability" as "the state of being so incapacitated."

occupational disease—in terms of the employee's ability to continue performing work in a particular "occupation" is not a favored one among the States. Most States either treat an occupational disease in the same manner as an accidental injury or condition a claimant's right to compensation in occupational disease cases more directly on the basis of whether the claimant has suffered some actual wage loss or loss of earning potential by reason of the disease. The caselaw in those States, therefore, is not particularly helpful.

We have discovered no case construing the word "occupation" precisely in this context. Some courts have loosely defined the concept of disability, in occupational disease cases, in terms of whether the employee "was disabled from earning full wages in the work in which he was last exposed" (*Ferguson & Lange Foundaries, Inc. v. Industrial Com.*, 380 Ill. 185, 43 N.E.2d 684, 687 (1942)), or whether he is "so disabled from the progress of the disease as to prevent him from efficiently performing his work" (*Argonaut Min. Co. v. Industrial Acc. Commission*, 21 Cal. App.2d 492, 70 P.2d 216, 219 (1937)) or "when incapacity for the particular form of work occurs" (*Natural Products R. Co. v. Court of Common Pleas*, 123 N.J.L. 522, 10 A.2d 148, 149 (N.J.1940)); but none of the cases wherein such expressions are found involved the kind of situation now before us.

In its ordinary signification, the word "occupation" means something more than a particular job. Webster's 3rd Int'l Dictionary defines "occupation" as "the principal business of one's life: a craft, trade, profession or other means of earning a living," which is consistent with the meanings generally given by the courts. *See, for example, Indemnity Ins. Co. of North America v. Sloan*, 68 F.2d 222, 226 (4th Cir.), *cert. denied* 292 U.S. 625, 54 S.Ct. 630, 78 L.Ed. 1480 (1934); *McPeck v. Travelers' Equitable Ins. Co.*, 55 N.D. 750, 215 N.W. 217, 220 (1927); *Young v. Whitehall*, 229 N.C. 360, 49 S.E.2d 797, 802 (1948). In this sense, an "occupation" may encompass several different kinds of jobs

and work environments. The one caveat, which has been expressed by courts in the few States having statutes analogous to our own and which, we think, has merit, is that the term "occupation" cannot be read so broadly as to encompass all manner of "labor" and thus to deny compensation merely because the diseased employee can perform some kind of "labor" activity. *See, for example, Holman v. Oriental Refinery,* 75 N.M. 52, 400 P.2d 471, 476 (1965), where the court expressly declined to consider "labor" as an "occupation" and thus to deny benefits to an employee who was disabled from working as a filling station operator merely because "he is still able to work in other fields...." *See also LeBlanc v. Commercial Union Assur. Co.,* 349 So.2d 1283 (La.App.1977); *Ferrand v. Kaiser Aluminum & Chemical,* 398 So.2d 37 (La.App.1981).

This, we think, is the intended meaning for purposes of § 22. An incapacity to work in one set of conditions applicable to a particular job does not necessarily indicate or equate with an incapacity to perform the work in an occupation. Whether a disablement suffices to be occupational in scope would depend, at least in part, upon how the occupation is defined and how much of the range of activity fairly included within the occupation is in fact foreclosed to the claimant. If, indeed, the claimant is able to continue to perform reasonably analogous work within the same occupational classification at the same or higher wages, he is not incapacitated "from performing his work in the last occupation." That is the meaning we derive from *Belschner* and from the statute itself.

We do not view the issue of disablement, then, strictly in terms of the last job or employment held by the claimant. The claimant is not disabled, for purposes of § 22, simply because she can no longer perform that particular job; nor is she to be regarded as not disabled merely because she is able to work at some other job and has therefore suffered no actual wage loss. The focus must be on the occupation.

The record before the commission is scanty. We cannot tell precisely what kind of work Ms. Adams performed in

1976, in 1980, or in 1982, or what kind of work she performs now. We know only that the earlier work involved an air gun and that her present work does not. Whether the two jobs may reasonably be regarded as being within the same occupation is not at all clear. In the circuit court, there is no evidentiary record at all; the case was decided on summary judgment.

Although it might appear that Ms. Adams, in both instances, worked on a factory assembly line and that both jobs fall within the same occupation, in light of the poor record, that determination should not have been made on summary judgment. We shall therefore vacate the judgment and remand the case to the circuit court for further proceedings. A factual record will have to be developed, either in the circuit court or, on further remand, by the Commission, from which findings can be made as to (1) the last occupation in which Ms. Adams was injuriously exposed to the hazards of her occupational disease, and (2) whether she is disabled by reason of that occupational disease from performing work in that occupation.

JUDGMENT VACATED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS; APPELLEE TO PAY THE COSTS.