528 A.2d 486

**Doris M. MILLER**

v.

**WESTERN ELECTRIC COMPANY.**

No. 144, Sept. Term, 1986.

Court of Appeals of Maryland.

July 29, 1987.

James J. Nolan, Jr. (Brennan & Brennan, on brief), Balti-more, for appellant.

Steven S. Stephens (Joseph B. Harlan and Birrane, Harlan & Sharretts, on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., COLE, RODOWSKY, COUCH *, McAULIFFE and ADKINS, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (Retired) Specially Assigned.

ADKINS, Judge.

Maryland provides worker compensation benefits when an employee "suffers from an occupational disease, and is thereby disabled from performing his work in the last occupation in which he was injuriously exposed to the hazards of such disease...." Md. Code Ann. (1957, 1985 Repl.Vol.) Art. 101, § 22(a). For purposes of this occupational disease provision, " '[D]isablement' ... means the event of an employee's becoming actually incapacitated, either partly or totally, because of an occupational disease ...; and 'disability' means the state of being so incapacitated." Art. 101, § 67 (15) [emphasis in original].

In Adams v. Western Elec. Co., 63 Md.App. 587, 593, 493 A.2d 392, 395, cert. denied, 304 Md. 301, 498 A.2d 1186 (1985), the Court of Special Appeals had before it our interpretation of these provisions in Belschner v. Anchor Post Products Co., 227 Md. 89, 175 A.2d 419 (1961). It said:

> If, indeed, the [occupational disease] claimant is able to continue to perform reasonably analogous work within the same occupational classification at the same or higher wages, he is not incapacitated "from performing his work in the last occupation." That is the meaning we derive from Belschner and from the statute itself [emphasis in part supplied].

In the case before us, the Court of Special Appeals, relying on its Adams, took the same view of Belschner. Reversing

---

* Couch, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

the Circuit Court for Baltimore City, it denied appellant, Doris M. Miller, permanent partial occupational disease disability benefits principally because there was no showing that the disease had produced a diminution in her earnings. Because we believe *Belschner* does not make actual wage loss a prerequisite for the recovery of benefits in an occupational disease case, we reverse.

## I

Miller was employed by the appellee, Western Electric Company, from 1970 until 1985 when she was laid off because of a plant closing. Her position was that of a solderer, though over the years she temporarily assumed the positions of process checker, assembler and machine operator. During the course of her employment as a solderer, she developed an occupational disease, carpal tunnel syndrome, that afflicted her hands and wrists. This condition necessitated medical attention, and in late 1980, surgery to both wrists. Following a period of temporary total disability, Miller returned to work in January 1981 and assumed light duties for three months, after which she returned to her solderer position. The surgery apparently was not completely successful as Miller continued to suffer pain and limited mobility in her left hand and wrist. This condition caused staff physicians at Western Electric to place Miller on several temporary work restrictions, and in January 1985, she was placed on a permanent work restriction. At that time she also assumed the position of machine operator apparently due to the abolition of her solderer position.

Later in 1985, Miller filed a claim for permanent partial disability benefits with the Workmen's Compensation Commission. After a hearing, the Commission determined that Miller had sustained a 20 percent permanent partial disability of the left hand as a result of an occupational disease and awarded compensation. Western Electric appealed this determination to the Circuit Court for Baltimore City. In a jury trial, the Honorable Marvin B. Steinberg presiding,

Miller testified that when she resumed her solderer position, she performed the job in the same manner as she had previously, but was unable to work as fast as before the surgery or to make the company "rate" because she was plagued with stiffness and pain.[1] She also testified as to a diminished ability to handle tools or do household chores. It is undisputed that from the time of her surgery until layoff, Miller did not experience a diminution in wages. During that time she received regularly scheduled wage increases and overtime pay. Miller testified that at Western Electric workers were eligible for overtime work if they made 75 percent of the company "rate."

Testimony was also offered by Patricia Karczewski, a Western Electric benefits investigator. She testified as to Miller's wages and work restrictions, and also explained that a worker's failure to make the company rate normally resulted in a disciplinary "write-up," and Miller's personnel file did not contain notations as to any such action.

At the conclusion of the evidence, Western Electric's motion for judgment was denied. The trial court then instructed the jury in pertinent part as follows:

> Under the Maryland Workmen's Compensation law where an employee suffers from an occupational disease and is thereby disabled from performing her work in the last occupation in which she was injuriously exposed to the hazards of that disease, and the disease was due to the nature of the occupation or process in which she was employed within that period previous to her disablement, then the employee will be entitled to compensation under the Workmen's Compensation law of Maryland.

> An occupational disease is defined in our statute. It's defined in this way. An occupational disease means the event of an employee becoming actually incapacitated either temporarily, partially or totally because of a dis-

---

1. The "rate" was a production or piecework quota required of an employee.

ease contracted as a result of and in the course of employment in the manner I have just described to you.

The word disablement is also defined under the Maryland law. Disablement means the event of an employee becoming actually incapacitated either partly or totally because of an occupational disease from performing her work in the last occupation in which she was exposed to the hazards of that disease, and disability means the state of being so incapacitated.

* * * * * *

Now, in determining whether or not Mrs. Miller lacked the ability to continue to perform her work partly—there is no question that the word totally is not applicable here. It's only partly. In determining whether or not she lacked the ability to continue to perform her work partly you may take into consideration those factors—that she had to work slower, that she worked overtime hours, that she earned more dollars as a result of the overtime hours—and you may take into consideration those factors in determining whether in your opinion you find as a fact that she was either not able or able to continue to perform her work partly.

Western Electric, citing *Belschner*, excepted to the refusal of the trial court to instruct the jury that

If you find from the evidence that the Claimant was able to continue to perform her work in a satisfactory manner without loss of wages in the same occupation she had performed before the onset of the occupational disease, you must find that the Claimant suffered no permanent disability in this case.

After deliberations, the jury returned with a verdict, finding that Miller suffered a 20 percent permanent partial disability of her left hand as a result of her occupational disease. After entry of judgment on that verdict, and denial of its motion n.o.v., Western Electric appealed to the Court of Special Appeals. It argued that under *Belschner* it was entitled to judgment as a matter of law, or to

instructions that would have required the jury to find in its favor if the jury determined that Miller was able to continue performing her work in a satisfactory manner without loss of wages. As we have seen, that court found its interpretation of *Belschner* controlling. Because Miller had continued to perform her job in satisfactory manner without loss of wages, it concluded she was not entitled to compensation and reversed. We granted *certiorari.*

## II

Miller argues that our decision in *Belschner* has been erroneously interpreted as creating an irrebuttable presumption that an employee suffering from an occupational disease who returns to work at the same or higher wage level is not compensably disabled, *see, e.g., Adams, supra.* Moreover, she asserts that a litmus wage-loss test in occupational disease cases contravenes the letter and spirit of the workers' compensation statute. These arguments compel a thorough re-examination of our *Belschner* decision and the occupational disease provisions of the statute. We begin that re-examination by placing the statutes examined in *Belschner* within an appropriate framework. We are dealing with statutory construction, and our basic task is to determine what goals or objectives the legislature was attempting to achieve when it enacted those laws. That determination must be made by considering the statutes in their proper context. *Kaczorowski v. Mayor and City Council of Baltimore, et al.,* 309 Md. 505, 525 A.2d 628 (1987).

When comprehensive worker compensation first came to Maryland in 1914, the law provided for compensation only for accidental injury arising out of and in the course of employment.[2] There was no statutory provision covering

---

2. Even prior to 1914, the Maryland legislature demonstrated concern for the plight of injured workers by enacting a limited compensation scheme for miners as early as 1902. Other remedial legislation, designed to protect workers from the consequences of accidents, was

compensation for the effects of occupational disease. *Belschner*, 227 Md. at 92, 175 A.2d at 420.[3] Moreover, in an accidental injury case, a claimant was not required to show actual loss of wages in order to recover. In the case of permanent partial disability produced by accidental injury, benefits were determined (in the case of a scheduled injury) by a formula involving a percentage of the claimant's average weekly wage and a specified number of weeks. Md. Code Ann. (1914) Art. 101, § 36.3. In "other cases" of permanent partial disability, § 36.3 provided that "compensation shall be fifty *per centum* of the difference between [the claimant's] average weekly wages and his wage-earning capacity thereafter in the same employment or otherwise, if less than before the accident (but not to exceed twelve dollars per week), . . ." and subject to a cap of $3,000.[4] Thus, although earning capacity was a factor to be considered in accidental injury claims (at least in "other cases") actual wage loss was not a measure of disability or a prerequisite to compensability. *Baltimore Tube Co. v. Dove*, 164 Md. 87, 99, 164 A. 161, 165 (1933); *Baltimore Publishing Co. v. Hendricks*, 156 Md. 74, 79, 143 A. 654, 655–656 (1928); *see also Hall v. Willard Sand & Gravel Co.*, 60 Md.App. 260, 482 A.2d 159 (1984) (in an accidental injury case, the court held that evidence of impaired earning capacity, as demonstrated by post-injury earnings, is admissible to determine degree of permanent partial disability).

---

enacted in 1910 and 1912. *See* Case Note, *Workmen's Compensation—Permanent Partial Disability—Evidence of Actual Wages as a Factor to be Considered in Determining Claimant's Loss of Earning Capacity. Hall v. Willard Sand & Gravel Co., 60 Md.App. 260, 482 A.2d 159 (1984)*, 15 U.Balt.L.Rev. 353, 357 n. 34, n. 35 (1986) (authored by Ralph E. Wilson, III).

**3.** In *Victory Sparkler Co. v. Francks*, 147 Md. 368, 128 A. 635 (1925), the Court allowed compensation for a disease caused by the employer's negligence. A disease so caused, it concluded, was a compensable accidental injury, not a non-compensable occupational disease.

**4.** Except for changes in monetary amounts, this provision remained substantively unchanged until ch. 895, Acts of 1947, amended it to essentially the form now found in Art. 101, § 36(4)(a).

Thus stood Maryland's worker compensation law in 1939, when statutory occupational disease provisions first appeared by virtue of ch. 465 of the Acts of that year. The advent of those provisions must be viewed against the background we have summarized, as well as against their own history.

We begin with 1935. In that year, a bill to provide compensation for occupational disease failed—not the first time legislation of this sort had been rejected. Shriver, *The Maryland Occupational Disease Law*, 4 Md.L.Rev. 133, 136 (1940) (hereinafter Shriver). The significance of 1935 is that in that year the General Assembly adopted a joint resolution directing the Governor to appoint a commission to study the problem. Governor Nice did so. The commission surveyed occupational disease laws that existed in the several states. The Surgeon General of the United States surveyed the medical aspects of the matter. Extensive public hearings were held, and in 1936 the commission recommended proposed legislation. In 1937 the legislation passed the Senate, but died in committee in the House of Delegates. Shriver, 4 Md.L.Rev. at 137–138.

Governor Nice had the commission continue its work. In 1938, Attorney General O'Conor, a candidate for Governor, included support of the commission legislation in his platform. As Attorney General, he had been the commission's legal advisor. In 1939, after his election as Governor, he secured passage of the occupational disease law. Shriver, 4 Md.L.Rev. at 138.

Legislative reluctance to provide relief for those suffering from occupational disease may have had several bases: general unawareness of the problem in earlier years; suspicion that the contraction of occupational disease as a result of employment conditions was speculative; concern about drawing the line between occupational disease and non-occupational disease; worry over allocating to a particular employer the cost of compensation for an ailment that might develop slowly over a long period of time and in the course of several employments. *See* Shriver, 4 Md.L.Rev. at 134;

*see also Bint v. Creative Forest Products,* 108 Idaho 116, 697 P.2d 818; *appeal dismissed,* 474 U.S. 803, 106 S.Ct. 35, 88 L.Ed.2d 28 (1985); 1B A. Larson, *Workmen's Compensation Law,* § 41.20 (1987). In any case it is clear that the struggle to achieve this legislation in Maryland was prolonged and difficult. It is equally obvious that the legislative objective, consistent with the underlying purpose of worker compensation, was to provide an essentially no-fault limited remedy for workers who became disabled, totally or partially, because of occupational disease. Occupational disease was recognized as a problem, like on-the-job accidental injury, that an industrial society had to address in a comprehensive fashion. It is, finally, clear that the legislature decided to treat occupational disease differently, in some respects, from accidental injuries. The nature and extent of the differential treatment are at the heart of this case.

What is now Art. 101, § 22(a) provides: [5]

Where an employee of an employer subject to this article suffers from an occupational disease, and is thereby disabled from performing his work in the last occupation in which he was injuriously exposed to the hazards of such disease, ... and the disease was due to the nature of the occupation or process in which he was employed within the period previous to his disablement as limited in § 23 of this article, the employee or, in the case of his death, his dependents shall be entitled to compensation in the amount and payable in the manner provided elsewhere in this article, as if the disablement or death were an injury by accident, except as otherwise provided in §§ 22, 23, 26, and 27 of this article; and the practice and procedure prescribed elsewhere in this article shall apply to proceedings for compensation for the diseases, except

---

**5.** Because the pertinent statutes as they now read do not materially differ from their progenitors in any way that affects this case, we shall quote the present provisions.

as provided in §§ 22, 23, 26, 27, 52, 56, and 67 of this article.

Section 23(c) emphasizes legislative concern with causation:

An employer shall not be liable for any compensation for an occupational disease unless:

(1) Such disease is due to the nature of an employment in which the hazards of the disease actually exist, and it may reasonably be concluded, based on the weight of the evidence, that the disease was incurred as a result of his employment; or

(2) The manifestations of the disease are consistent with those known to result from exposure to a given physical, biological, or chemical agent attributable to his type of employment, and it may reasonably be concluded, based on the weight of the evidence, that the disease was incurred as a result of his employment.

And § 67 contains two definitions unique to occupational disease:

(13) *"Occupational disease"* as used in this article shall mean the event of an employee's becoming actually incapacitated, either temporarily, partially or totally, because of a disease contracted as the result of and in the course of employment, as provided by § 22 of this article [emphasis in original].

\* \* \*

(15) *"Disablement,"* as used in § 22 of this article means the event of an employee's becoming actually incapacitated, either partly or totally, because of an occupational disease, from performing his work in the last occupation in which exposed to the hazards of such disease; and *"disability"* means the state of being so incapacitated [emphasis in original].

When we juxtapose these provisions against the worker compensation scheme that existed at the commencement of the 1939 legislative session, what emerges with respect to

the use of demonstrated wage loss as a prerequisite to compensation for occupational disease?

We recall that actual wage loss was not then (as it is not now) a factor in determining eligibility for accidental injury compensation. We observe that the 1939 occupational disease legislation contains no mention of wage loss as a factor. This is of some significance. Records of the study commission show that considerable attention was given to New York occupational disease law, for New York was a pioneer in this field. *See* Maryland Commission for Study of Occupational Disease, 1939: Vol. I Public Hearings at 94, 105–108, 223–224, 299–304; 1B Larson, § 41–20 at 7–366. For example, the schedule that originally was set forth in § 34 (*see* n. 6, *infra*) was likely modelled on New York's similar approach. *See* N.Y.Work.Comp.Law § 3 (Consol. 1982). The New York law, however, contained a definition of "disability" (unchanged since its enactment in 1920) quite different from that included in the Maryland law: the "state of being disabled from earning full wages...." N.Y.Work.Comp.Law § 37 (Consol.1982); *Muniak v. ACF Industries,* 7 A.D.2d 258, 259, 182 N.Y.S.2d 539, 540 (1959). The omission of the New York definition from the Maryland proposal suggests that wage loss was not on the minds of the framers of the 1939 Maryland law, just as it was not a factor in the original 1914 worker compensation legislation.

How, then, did the legislature mean to differentiate between compensability for occupational disease and compensability for accidental injury? The answer begins with the definitions of "occupational disease" and "disablement" as found in Art. 101, § 67 (13) and (15). As we have noted, the former definition includes the notion of "an employee's becoming actually incapacitated, either temporarily, partially or totally, because of a disease contracted as the result of and in the course of employment...." The definitions of "injury" and related terms in § 67 (6) contain no comparable requirement of "actual incapacitation." The § 67 (15) definition of "disablement" repeats the requirement of actual incapacitation and explains that the incapacitation must

be "from performing his work in the last occupation in which [the claimant was] exposed to the hazards of" an occupational disease. There is no definition of "disablement" applicable to accidental injury.

These provisions suggest a legislative concern with the nature of occupational disease. Its onset may occur over considerable time, and its effects may be long-hidden. Moreover, it may be difficult to trace causation to the claimant's employment. A similar concern with causation— the relation of the disease to a particular employment—is seen in § 23(c). The claimant must produce evidence that the disease "is due to the nature of an employment in which the hazards of the disease actually exist" or that "[t]he manifestations of the disease are consistent with those known to result from exposure to a given physical, biological, or chemical agent attributable to his type of employment...." In either case, the employer is not liable unless "it may be reasonably concluded, based on the weight of the evidence, that the disease was incurred as a result of [the claimant's] employment." [6]

These concerns pertaining to occupational disease explain why the legislature treated disease compensability somewhat differently than accidental injury compensability. The problems of showing disability and causation simply appear less formidable in the latter context. The injury, at least to the lay eye, is relatively easy to see and evaluate, and its connection to the employment is more readily apparent. Thus the legislature attached an actual incapacitation re-

---

**6.** The legislative emphasis on the relationship between a particular disease and a particular employment is even more apparent in the initial occupational disease law. Art. 101, § 34, as contained in the 1939 Code contained a list of diseases (column 1) and a list of occupations or processes (column 2). For example, column 1 began with "Anthrax" and the comparable item in column 2 was "Handling of wool, hair, bristles, hides, or skins." A claimant had to show exposure to an occupational disease listed in column 1 while engaged in an *occupation or process* specifically related to that disease in column 2. The claimant was then deemed to be engaged in an "extra-hazardous occupation," a threshold requirement for compensability at that time.

quirement to occupational disease compensation whereas it did not do so in the case of accidental injury. And it took great care to assure that the cause of the disease was related to a particular occupation and the cost of compensation for its effects laid on a particular employer. *See Lowery v. McCormick Asbestos Co.*, 300 Md. 28, 33, 475 A.2d 1168, 1171 (1984); *Adams, supra,* 63 Md.App. at 591, 493 A.2d at 394. Wage loss or post-injury earnings in general do not, of course, bear on the causation factor. The determination of an award for benefits, for either an accidental or disease-related injury, presumes causation, because that is the threshold requirement to finding an occupational disability. This point was recently illustrated in *Moes v. City of St. Paul*, 402 N.W.2d 520, 528 (Minn.1987). There the court held that permanent partial disability benefits for occupational disease injuries do not require a demonstration of actual wage loss. It rejected the argument that a restrictive recovery scheme for occupational disease is necessary because causation is less clear: "the causation question is determined by the compensation judge when determining if the injury is an occupational disease...."

But because the legislature required a showing of actual incapacitation in occupational disease cases, together with a more intense causation analysis, does not mean that it intended a wage-loss requirement as a prerequisite to compensation. As we have already observed, actual wage loss as a prerequisite to worker compensation was a notion foreign to Maryland law in 1939. It is not unreasonable to conclude that the 1939 legislation's silence in that respect was the product of awareness of the already-existing provisions relating to the quite different concept of loss of earning capacity. Moreover, reliance on wage loss as the conclusive factor establishes an irrational criterion for awarding compensation benefits. It is irrational because a worker may be partially disabled by virtue of occupational disease, but earn more after the disability than before it. This may occur not because of lack of actual incapacitation but because increases in rate of pay, cost-of-living raises, or

the like, produce that outcome. There is evidence of circumstances such as these in the record in this case.[7]

Indeed, strict adherence to a wage-loss requirement has the potential for absurd results. It may deprive a physically-disabled worker of an award, and essentially penalize the worker's "laudable" efforts to keep working. It also promotes the fiction that a worker, simply because of his level of earnings, is not suffering from a permanent partial disability. *See* 2 Larson § 57.11 at 10–12.

■ If a statute contained plain language that, read literally, produced an absurd result inconsistent with the purpose of the statute we would not be compelled to read that language literally. *Kaczorowski v. Mayor and City Council of Baltimore, supra,* 309 Md. at 516, 525 A.2d at 632. Much less should we read a statute to produce an absurd result, inconsistent with its purpose, when it contains no language even hinting at such a reading.

■ We hold, therefore, that one who claims compensation for permanent partial disability produced by an occupational disease need not show actual wage loss as a prerequisite to recovery.

■ Actual incapacity from employment (whether total or partial) is the test in occupational disease cases, and we recognize that this differs from the anatomical or industrial loss of use that is the critical factor in accidental injury cases. *See* M. Pressman, *Workmen's Compensation in Maryland,* § 3–10 (3)(a) (2d ed. 1977). That a claimant's wages have not diminished or have increased since the

---

7. It is perhaps for these reasons, among others, that actual wage loss is not favored as a conclusive determinant of compensability with respect to either accidental injury or occupational disease claims. *See* 2 Larson § 57.31 at 10–164.3—10–164.4 (accidental injury); *but see Reeves v. Echota Cotton Mills,* 123 Ga.App. 649, 651, 182 S.E.2d 126, 128 (1971) (court upheld a denial of benefits to a partially disabled worker whose post-injury earnings exceeded his earnings prior to injury. The claimant's post-injury employment was at a reduced wage, but his actual post-injury earnings were higher, because he worked a 48 hour week rather than a 40 hour week).

onset of disease may be relevant on the issue of actual incapacity. Absent any other evidence of actual incapacity, a showing of lack of wage loss might justify a fact-finder in concluding that there was no actual incapacity. But proving actual wage loss is not a *sine qua non* of obtaining compensation for occupational disease. *See Island Creek Coal v. Fletcher,* 201 Va. 645, 112 S.E.2d 833 (1960); *Kubachka v. State Workmen's Comp. Com'r,* 163 W.Va. 601, 259 S.E.2d 21 (1979); *Royal-Globe Ins. v. State Dept. of Ind.,* 82 Wis.2d 90, 260 N.W.2d 670 (1978); *Kohler v. Department of Industry, Labor & Human Relations,* 42 Wis.2d 396, 167 N.W.2d 431 (1969). *See also Sjoberg's Case,* 394 Mass. 458, 476 N.E.2d 196 (1985), and *Fermo v. Superline Products,* 175 Mont. 345, 574 P.2d 251 (1978) (advancing a similar rationale in the context of accidental injury).

## III

Western Electric, of course, argues that *Belschner* requires the contrary result. We recognize that the opinion in that case may be so read. Indeed, as we noted early on, it occasionally has been so read. We think, however, that close analysis of the decision does not support Western Electric's contention, although some clarification of *Belschner* is certainly in order.

Belschner had suffered a 44 percent hearing loss as a result of industrial noise—noise to which he had been exposed because of his work as a saw operator. Despite the hearing loss he continued to work as a saw operator, and without any loss of wages. The *Belschner* court recognized, as do we, that the legislature intended to treat occupational disease somewhat differently from accidental injury. It noted that in an accidental injury case "a claimant need not show loss of wages or earning capacity in order to be entitled to compensation...." 227 Md. at 92,

175 A.2d at 421.[8] Thus, an accidental injury claimant did not have to show actual incapacitation, but by virtue of Art. 101, § 67 (15), an occupational disease claimant did.

The *Belschner* court cited a single Texas case to conclude that

> an employee is not incapacitated within the intent of the law "if, though injured, [he] still has the capacity, the ability to, and does continue to perform his regular work, for which he was employed, and receives his usual pay for the work." *Lumbermen's Reciprocal Ass'n v. Coody*, 278 S.W. 856 (Tex.Civ.App.1926).

227 Md. at 93, 175 A.2d at 421.

The *Belschner* court then explained that

> [i]n a recent New York case ... where it was stated that for industrial purposes a "disability" in the case of an occupational disease is deemed "to exist when there is some resulting adverse change in wage earning," it was aptly pointed out that the reason for this policy is that an "accident" is an occurrence usually having some outward manifestation of cause and effect, but a "disease" may exist and continue for a long period without outward manifestation until it is revealed in one way or another by the person affected.

227 Md. at 94, 175 A.2d at 422.

*Coody* involved a foreman who broke his arm but returned to the job with his arm in a sling and continued to work for full wages. He then applied for *total incapacity* benefits. The Texas statute allowed benefits where there existed an "incapacity for work" and Coody was denied benefits. Texas makes clear, however, that under its statute, wage loss is not a prerequisite to compensation. A claimant's return to work at the same or a higher wage level is a factor to be considered, but alone is not conclusive,

---

8. As of the date of *Belschner,* this statement was substantially correct. Earning capacity was, however, a specific factor in accidental injury cases in 1939, when the occupational disease law was enacted. It remained so until 1947. *See* n. 3, *supra.*

especially where the claimant has returned to work out of economic necessity. *See Navarette v. Temple Independent School Dist.*, 706 S.W.2d 308 (Tex.1986); *City of McAllen v. Alvaredo*, 718 S.W.2d 903 (Tex.Civ.App.1986).

Indeed, this was the law in Texas long before 1986. In the same year it decided *Coody* (1926), the Texas Court of Civil Appeals considered the issue of "whether an employee who has suffered an injury resulting in permanent *partial* incapacity for work, who resumes work for the master at the same wages paid him before receiving the injury, is ... entitled to compensation for the incapacity suffered" [emphasis supplied]. In an opinion written by the same judge who authored *Coody*, the court noted that the Texas statute was intended to provide compensation "to employees for permanent partial incapacity, whether they be engaged in the same or different employment, if the earning capacity be impaired or reduced." The court concluded that an injured worker's return to employment at the same or higher wages "is not conclusive that his disability has ceased or that he is not disabled." It distinguished *Coody* on the basis that the claimant there had claimed a total incapacity for work. *Dohman v. Texas Employers' Ins. Ass'n*, 285 S.W. 848, 850 (Tex.Civ.App.1926) (O'Quinn, J.); *see also Texas General Indemnity Co. v. Mannhalter*, 290 S.W.2d 360 (Tex.Civ.App.1956) (suggesting that *Coody* is no longer good law).

With respect to the New York case cited in *Belschner*, *Muniak v. ACF Industries, Inc.*, 7 A.D.2d 258, 182 N.Y. S.2d 539 (1959), the Court did not point out that it was decided under a statute which, unlike the Maryland law, defined "disability" for occupational disease purposes as the "state of being disabled from earning full wages...." And even that definition the New York court read as relating to earning capacity rather than actual wage-loss: "Thus the New York statute, as well as that of England, made it necessary that an occupational disease actually affect earning capacity in some adverse way before it would be regarded as compensable." 7 A.D.2d at 260, 182 N.Y.S.2d at 541.

We believe that *Belschner* states no more than the Texas rule: lack of wage loss may be relevant to show absence of actual incapacity, but is not necessarily conclusive. This reading of *Belschner* becomes clearer when we look at the facts before the Court. They are set forth thus, 227 Md. at 91, 175 A.2d at 420:

There was testimony by the foreman, under whom he worked, that the claimant was still performing his duties as a saw operator in a satisfactory manner. There was also a colloquy between counsel for the claimant and the medical board as to whether the impairment of hearing had affected the capacity of the claimant to work, but when a member of the board interposed an observation that the claimant was doing his work "just as well" and "producing the same thing" as he did before the impairment and was "making the same living," the discussion seems to have ended.

From this, two things are apparent. The first is that there was no evidence at all that Belschner's hearing loss to any extent incapacitated him from his employment or occupation as a saw operator. The second is that wage loss was considered as simply one of several pertinent items tending to demonstrate that fact. It is given no greater importance than doing work "just as well" and "producing the same thing." This is also true of *Coody*. It reinforces our conclusion, consistent with our reading of the statutes, that *Belschner* establishes no more than that wage loss at most is one of several factors to be considered when making a determination of actual incapacitation. 2 Larson § 57.31 at 10–156—10–157.[9]

---

9. Western Electric insists that we should not so read *Belschner* because the legislature has acquiesced in Western Electric's view of that case, thereby indicating that this view represents the true legislative intent. *Jones v. State,* 307 Md. 449, 455, 514 A.2d 1219, 1222 (1986). We are not persuaded. Very few reported decisions adopt Western Electric's view of *Belschner.* *Babcock & Wilcox, Inc. v. Steiner,* 258 Md. 468, 265 A.2d 871 (1970), does so by implication, but was decided on a basis other than failure to show wage loss. It found *Belschner* inapplicable. 258 Md. at 477 n. 2, 265 A.2d at 874. *Adams v. Western*

## IV

For the reasons we have stated, we hold that the Court of Special Appeals erred in its application of a conclusive wage-loss test to the facts of this case.[10]   But in addition to the wage-loss argument it presented to the intermediate court, Western Electric contended (as it does here) that it was entitled to judgment as a matter of law because the record demonstrates that Miller's performance of her solderer's job had at all times been "satisfactory."   This argument is derived from *Belschner's* indication that "an employee, who has continued to perform his work in a *satisfactory manner* without loss of wages in the same occupation he had been engaged in for years," is not

*Electric Co., supra,* supports Western Electric by way of dicta, but was decided on an issue not involving wage loss.   Other cases citing *Belschner* simply view the holding as denying compensation to one who can perform the same job, without mention of wage loss, *Lucky Stores, Inc. v. Street,* 63 Md.App. 664, 675, 493 A.2d 431, 436–437 (1985), or cite it for some purpose unrelated to wage loss, *Oros v. City of Baltimore,* 56 Md.App. 685, 690, 468 A.2d 693, 695–696 (1983), *aff'd,* 301 Md. 460, 483 A.2d 748 (1984);   *Montgomery County Police Dep't. v. Jennings,* 49 Md.App. 246, 253–254, 431 A.2d 721, 725 (1981);   *Armco Steel Corp. v. Trafton,* 35 Md.App. 658, 659, 371 A.2d 1128, 1129, *cert. denied,* 281 Md. 733 (1977);   *Colgan v. Board of County Comm'rs,* 21 Md.App. 331, 336, 320 A.2d 82, 86 (1974), *aff'd,* 274 Md. 193 (1975).   Thus, the Western Electric interpretation has not been frequently stated.   Furthermore *Belschner* has not always been read the way Western Electric interprets it.   In *Wagner v. Allied Chemical Corp.,* 623 F.Supp. 1412, 1416 (D.Md.1985), Judge Young viewed *Belschner* as dealing with wage-earning capacity, not actual wage loss.   Judge Steinberg, in the case now before us, read *Belschner* as we read it. The interpretation, therefore, in which the legislature is supposed to have acquiesced is less than pellucid.   Finally, if *Belschner* is viewed essentially as an occupational deafness case, it may well be that the legislature responded in a way that altered the rule applied in cases of that sort.   *See* Art. 101, § 25A, as construed in *Crawley v. General Motors Corp.,* 70 Md.App. 100, 107, 519 A.2d 1348, 1352, *cert. denied,* 310 Md. 147, 528 A.2d 473 (1987);   Pressman, *Workmen's Compensation in Maryland, supra,* § 3–10(b) at 252 (Section 25A "motivated by the *Belschner* case . . .").

10.  For the same reasons, Western's wage-loss instruction was properly rejected by Judge Steinberg.

entitled to occupational disease compensation. 227 Md. at 90, 175 A.2d at 420 [emphasis supplied].

■ Western Electric, without citation to authority, posits that "satisfactory manner" means satisfactory to the employer. It correctly notes that the record contains no indication of its dissatisfaction with Miller's performance. But "satisfactory manner" relates to more than the employer's viewpoint. It suggests also a physically satisfactory or competent manner of performance; that is, the opposite of actual incapacity. Employer satisfaction or lack of dissatisfaction may well bear on this, but it is not conclusive. For reasons of sympathy or for less laudable reasons an employer may permit a partially incapacitated employee to continue working, and may express no dissatisfaction with the work. That fact alone, like absence of wage loss alone, does not prove actual incapacity as a matter of law. We repeat that actual incapacity to perform the occupation is the test, and it may be shown by evidence of matters other than or in addition to wage loss and employer dissatisfaction. *See, e.g., Midland-Ross Corporation v. Industrial Comm.*, 107 Ariz. 311, 486 P.2d 793 (1971) (a relevant factor is whether the claimant performed employment duties in pain or with physical adjustment); *City of McAllen v. Alvarado,* 718 S.W.2d 903 (Tex.App.1986) (claimant's return to work out of economic necessity is of relevance).

■ There was evidence in this case that Miller made more wages after the onset of her disease than she did before it. There was evidence that the rate of pay had increased. There was evidence, too, that she derived at least some of the additional wages from overtime work; that is, she had to work more time than previously to garner the increased wages. From this a fact-finder might infer that she was less capable of working than she had been previously—that is, that she was partially incapacitated.

There was evidence that personnel records contained no indication of dissatisfaction with her work. There was

evidence, too, that after the onset of the disease she could achieve 75 percent of her piecework "rate." From this, a fact-finder might infer that she could not achieve 100 percent of that "rate." Since one may assume that the "rate" is what an ordinarily productive worker is expected to achieve, a fact-finder might further infer that Miller was to some degree incapacitated because she could no longer make 100 percent of the "rate."

There was evidence that Miller had difficulty performing jobs other than solderer, and it is that particular occupation that Western Electric says is relevant, because it is the one from which she was allegedly incapacitated by the disease. Even putting aside that evidence and the problem of defining occupation, *see Adams, supra,* there was also testimony from Miller that she performed her soldering work less quickly and subject to some stiffness and discomfort. Indeed, Western Electric presented evidence that Miller was placed on several temporary work restrictions, and at the time of her lay-off was on a permanent work restriction, and performing the job of machine operator.

This evidence does not compel the conclusion that Miller was in fact partially incapacitated, but given the test applied on a motion for judgment, it was sufficient to go to the jury. A fact-finder, crediting all the evidence most favorably to Miller, and all reasonable inferences therefrom, could have found in Miller's favor by application of proper law to the facts. *Keys v. Chrysler Credit Corp.,* 303 Md. 397, 408–409, 494 A.2d 200, 205–206 (1985); *Exxon Corp. v. Kelly,* 281 Md. 689, 698, 381 A.2d 1146, 1152 (1978); Md. Rule 2–519. Judge Steinberg's instructions, as we have set them out earlier, appear to be in accordance with the law as we have held it to be, although we need not decide that issue, because it is not before us. In any case, the jury did find Miller disabled. Since that question was for the jury, we conclude that the Court of Special Appeals erred in holding that Western Electric was entitled to judgment as a matter of law because Western Electric had never indicated dissatisfaction with Miller's performance.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR ENTRY OF A JUDGMENT AFFIRMING THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY. APPELLEE TO PAY THE COSTS.

MURPHY, C.J., dissents.

MURPHY, C.J., dissenting.

Until today, *Belschner v. Anchor Post Products Co.*, 227 Md. 89, 175 A.2d 419 (1961), decided in 1961, stood for the proposition that, under the Maryland Workmen's Compensation Law, an employee who suffers from an occupational disease, but who returns to work at the same or a higher wage level, is not eligible for permanent partial disability benefits. In such circumstances, the employee, not having sustained an economic loss, is not "actually incapacitated," either partly or totally, "from performing his work in the last occupation in which he was injuriously exposed to the hazards of such [occupational] disease," as required by the statute. See Md. Code (1957, 1985 Repl.Vol) art. 101, § 22(a); § 67(13) and (15)). The Legislature has acquiesced in this interpretation of the statute for 26 years and thus the judicial gloss placed on the statute by *Belschner* is well engrained in the law. I do not, therefore, agree with the majority that a worker who claims compensation for permanent partial disability produced by an occupational disease need not show actual wage loss as a prerequisite to recovery. Accordingly, I respectfully dissent.

Actual incapacitation from work due to occupational disease is the test under the statute. As the majority recognizes, this test differs entirely from the anatomical or industrial loss of use criteria involved in accidental injury cases. *Belschner* cannot, in my judgment, fairly be read to establish, as the majority holds, that "wage loss at most is one of several factors to be considered when making a determination of actual incapacity." Indeed, as the Court of Special Appeals recognized in *Adams v. Western Elec-*

*tric Co.,* 63 Md.App. 587, 493 A.2d 392, *cert. denied* 304 Md. 301, 498 A.2d 1186 (1985), the precise issue in *Belschner* was whether an employee, who suffered from an occupational disease, but "who continued to perform his work in a satisfactory manner without loss of wages in the same occupation he had been engaged in for years" was entitled to permanent partial benefits. The Court in *Belschner* focused on whether, in such circumstances, the employee was actually disabled. It concluded that:

"an employee is not incapacitated [and therefore not disabled from an occupational disease] within the intent of the law 'if, though injured, [he] still has the capacity, the ability to, and does continue to perform his regular work, for which he was employed, and receives his usual pay for the work.'" 227 Md. at 93, 175 A.2d 419.

Accordingly, in *Belschner,* because the employee was able to continue to perform reasonably analogous work within the same occupational class at the same or higher wages, he was not actually incapacitated "from performing his work in the last occupation in which he was injuriously exposed to the hazards of [an occupational] disease."

However commendable the result reached by the majority in this case may appear, it is plainly at odds with the precepts of *Belschner,* and overlooks our closing statement in that case: "If there is a need to liberalize the law or to change what we think it plainly means, that is a legislative, not a judicial, function." 227 Md. at 95, 175 A.2d 419.

I would affirm the judgment of the Court of Special Appeals.